Stanley SIMMONS, Petitioner,

v.

UNITED STATES of America,
Respondent.

Barthelmio DALLI, Petitioner,

v.

UNITED STATES of America,
Respondent.

Nos. 72–CV–520, 72–CV–521.

United States District Court,
N. D. New York.

Feb. 22, 1973.

---

Alan Scribner, New York City, for petitioner Simmons.

Albert J. Krieger, New York City, for petitioner Dalli.

James M. Sullivan, Jr., U. S. Atty. for N. D. New York, for respondent; Paul V. French, Asst. U. S. Atty., Albany, N. Y., of counsel.

## OPINION

MacMAHON, District Judge.*

These are applications for post-conviction relief, brought under 28 U.S.C. § 2255, by two convicts now in federal custody.

Petitioner Dalli was convicted by a jury, along with Thomas Pytel, on May 26, 1969, on one count of selling, receiving, and concealing five kilograms (approximately eleven pounds) of heroin, in violation of 21 U.S.C. §§ 173 and 174, and on one count of conspiracy to commit the substantive offense, in violation of 18 U.S.C. § 371. He was sentenced on June 13, 1969 to twenty years imprisonment on each of the two counts, the sentences to run concurrently.

Petitioner Simmons jumped bail after the case had been called for trial in the midst of an evidentiary hearing on defendants' motion to suppress evidence on the ground that the seizure of the heroin stemmed from wiretaps by the New York state police. He was apprehended two and a half years later, in November 1971, and, upon his plea of guilty to one substantive count of purchasing five kilograms of heroin, in violation of 26 U. S.C. § 4704(a) and 18 U.S.C. § 2, was sentenced on February 7, 1972 to ten years imprisonment and fined $20,000.

Petitioner Dalli's conviction was affirmed on appeal. United States v. Dalli, 424 F.2d 45 (2d Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970). The facts of the case are fully narrated in the opinion of the Court of Appeals and familiarity with that opinion is assumed. Suffice it to say here that both petitioners, residents of New York City, were arrested and five kilograms of pure heroin were seized from their automobile on September 10, 1968, while they were returning to New York on the New York thruway after purchasing the heroin from the Canadian defendants, Pytel and Bourdeau, whom they had met at the Holiday Inn in Plattsburgh, New York.

Following the filing of the indictment in December 1968, petitioners made a number of motions, one of which sought the suppression of certain evidence, including the five kilograms of heroin, on the ground that the evidence had been seized upon an illegal arrest. The claim that the arrest was illegal was grounded on an allegation that it resulted from tainted information learned from wiretaps by the New York state police.

The motion to suppress was referred to the trial court, and when the case came on for trial on May 12, 1969, we granted a full evidentiary hearing. Following the hearing, we denied the motion to suppress and found that the search was incident to a lawful arrest based on probable cause and that neither the arrest nor the seizure was based on information tainted by wiretaps. Our

---

* Of the Southern District of New York, sitting by designation.

findings and conclusions were set forth in three opinions, which we append to this opinion. Familiarity with the facts set forth in those opinions will be assumed, but some repetition is necessary to intelligible consideration of the issues raised here.

All the wiretaps sought by the defendants upon the suppression hearing had been duly authorized under New York law (N.Y.Code Cr.Proc. §§ 814–825 (as of 1968)), which had been recently revised to meet the constitutional standards for electronic surveillance taught by the Supreme Court in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967), and cases cited therein. Thus, the warrants and renewals were strictly limited to wiretapping telephones listed to Beautee Trail Hair Stylists, Inc. and to Ronald J. Carr and had been issued initially on August 5, 1968 by Mr. Justice Miles F. McDonald of the Supreme Court of the State of New York, Second Judicial District. The application for the warrants was supported by a detailed affidavit which informed the Justice of the particular need for such wiretaps, the specific basis on which they were to proceed, and the precise intrusion which they would entail.

All of the wiretaps, recordings, and transcripts thereof, along with the warrants, renewals, and affidavits on which they were based, were produced upon the hearing and delivered to the defendants and their counsel for their inspection and selection of any wiretaps or other material which they regarded as relevant. After thorough examination of such materials by the defendant Dalli and his counsel, Richard I. Rosenkranz, Esq., the defendant Simmons and his counsel, Albert J. Krieger, Esq., now appearing for Dalli, and Robert P. Wylie, Esq., counsel for the then absent defendant Pytel, the defendants selected only one wiretap which they believed to be of any relevance.

The relevant wiretap on the telephone line of Beautee Trail Hair Stylists, Inc.

intercepted a telephone conversation between Dalli and Simmons on September 7, 1968 to the effect that they would meet at 7:00 o'clock that evening. It then appeared from reports of the Federal Bureau of Narcotics and Dangerous Drugs ("Federal Bureau of Narcotics"), also made available to defendants, that federal agents had observed the 7:00 o'clock meeting.

All witnesses desired by the defendants were produced, and the defendants then called Agent John T. O'Brien of the Federal Bureau of Narcotics, in charge of the investigation of the defendants; his superior, George R. Halpin; Agent John W. Maltz, who actually made the observation of the meeting; and Lieutenant Charles Cassino of the New York state police, who was in charge of a parallel investigation of the defendants by the state police. Despite exhaustive examination of all the witnesses, the defendants failed to establish any connection between any wiretap, surveillance of any defendant, the observation of the defendants Dalli and Simmons at the 7:00 P.M. meeting, and, ultimately, the arrest and seizure of the narcotics.

Agent O'Brien testified that he did not learn any information from any wiretaps during the course of the federal investigation and that he had no knowledge of any wiretaps relating to the defendants by the New York state police until about two weeks before the suppression hearing (May 12, 1969). Halpin testified that the Federal Bureau of Narcotics had not received any information from the state police learned as a result of wiretaps or otherwise which led to the investigation and arrest of the defendants. Lieutenant Cassino of the state police testified that he did not reveal any information learned from state wiretaps to anyone connected with the Federal Bureau of Narcotics.

Petitioners Dalli and Simmons now claim that the prosecution ** knowingly used perjured testimony upon the suppression hearing in that Agent O'Brien's

** There is no claim that the United States Attorney or his assistant knowingly used perjured testimony.

testimony that he was unaware of the state wiretaps until two weeks before the suppression hearing and that he did not learn any information from any wiretaps during the course of the federal investigation was false.

The claim is based on an affidavit of now ex-Lieutenant Charles Cassino, who is presently confined to a federal penitentiary following his conviction on one count of interstate and foreign travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952, and on one count of conspiracy to commit the substantive offense, in violation of 18 U.S.C. § 371, in the United States District Court for the Southern District of New York.

■ Much of Cassino's affidavit is a rehash of the allegations, grounds, and claims raised, heard, argued, considered, and rejected on the merits on the suppression hearing. It would serve neither the ends of justice nor any purpose whatever to reiterate the claims or to reconsider them here. Petitioners have, thus, had their day in court on those claims and we have had "our say." They may not, therefore, raise the same claims again. Kaufman v. United States, 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969); Sanders v. United States, 373 U.S. 1, 9, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Thornton v. United States, 125 U.S. App.D.C. 114, 368 F.2d 822, 833 (1966) (dissenting opinion of Wright, J.).

As new matter, Cassino now avers that after the September 7 meeting between Dalli and Simmons, the state police tapped "telephone numbers presently unknown to me located at or near the residence of Dalli . . . . It was on these telephones that an arrangement was made between Simmons and Dalli to go to upstate New York on September 10, 1968. My best recollection is that that telephone conversation took place on September 9, 1968 and was first heard by our office early in the morning hours of September 10, 1968 . . . . Subsequent to May, 1969, I learned that

it was a common practice during the course of this investigation for Investigator Kaynor [sic] to take the tapes representing the previous day's eavesdropping and together with Agent John J. O'Brien of the Bureau of Narcotics and Dangerous Drugs, go to . . . [a cubicle designed for audition of recorded telephone conversations] and there review the tapes . . . . As far as the 10th itself is concerned, I received a call early in the morning from Investigator Kaynor [sic] who told me of this probable meeting and I ordered him to contact all necessary parties immediately as to what we suspected and what we anticipated would occur . . . . Amongst those whom Investigator Kainor [sic] was to contact were Agents of the Bureau of Narcotics and Dangerous Drugs. The investigation and surveillance of September 10, which resulted in the arrest of Dalli and Simmons, Pytel and Bordeau, came about as a result of the orders which I gave after receiving the information from Investigator Kainor [sic] concerning the meeting between Dalli and Simmons."

■ Cassino's averments are not only indefinite, vague, and conclusory, but, insofar as he seeks to connect information learned by the state police from wiretaps on unknown telephones to the arrest of the defendants and seizure of narcotics from their automobile, his statements are blatant and inadmissible here. Plainly, information *learned* by Cassino from someone else is hearsay too unsubstantial to require a hearing or to support the instant applications. This is especially so when the hearsay is contradicted not only by the files and records of this case, consisting, among other things, of the inconsistent sworn testimony of Cassino, himself, upon the suppression hearing and before he had any motive to testify falsely, but also by the papers submitted by defendants in support of the previous motion to suppress, the papers submitted by the government in opposition to that motion, the testimony of Agent O'Brien and all

other federal agents who testified upon the suppression hearing, all the wiretaps there produced, all the documentary evidence there received, and by the earlier opinions and findings of this court. Finally, it is contradicted here by the affidavit of Edward W. Kayner, the public official now accused by Cassino of revealing information learned from these unidentified wiretaps. Kayner's affidavit specifically and convincingly denies that any wiretaps existed other than those produced on the prior suppression hearing and emphatically denies that he related any information learned from any wiretaps either to Agent O'Brien or to anyone else connected with the Federal Bureau of Narcotics. See United States v. Catalano, 281 F.2d 184 (2d Cir.), cert. denied, 364 U.S. 845, 81 S.Ct. 88, 5 L.Ed.2d 69 (1960); United States v. Branch, 261 F.2d 530, 533 (2d Cir. 1958), cert. denied, 359 U.S. 993, 79 S. Ct. 1125, 3 L.Ed.2d 981 (1959); United States v. Smith, 257 F.2d 432, 434 (2d Cir. 1958), cert. denied, 359 U.S. 926, 79 S.Ct. 609, 3 L.Ed.2d 629 (1959).

The hearsay nature of Cassino's attestations, his long silence, and his guarded averment that he learned about Investigator Kayner's alleged revelations "subsequent to May, 1969," i. e., after Cassino testified upon the suppression hearing, convince us that these applications for a hearing and for habeas corpus should be denied. United States v. Malcolm, 432 F.2d 809, 812 (2d Cir. 1970).

■ These applications, in reality, seek a second hearing of the defendants' motion to suppress evidence. Such a hearing is not warranted unless there is a substantial and creditable allegation of newly discovered evidence. Townsend v. Sain, 372 U.S. 293, 313, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). No such showing is made here.

■ If there were other wiretaps at or near Dalli's residence, which led to the arrest and seizure, obviously they were in existence at the time of the earlier hearing and it would have been just as easy to seek and obtain them as it was to seek and obtain wiretaps on the telephones of Beautee Trail Hair Stylists, Inc. and Ronald J. Carr. Surely, the most logical places for petitioners to suspect wiretaps would be upon their home telephones. If petitioners had exercised due diligence, such evidence, if it existed, would have been discovered and produced on the earlier hearing. Their failure even to seek such evidence can only be attributed to their inexcusable neglect. To find otherwise would only be to sanction needless piecemeal presentations of constitutional claims in the form of deliberate bypassing of orderly federal procedures. Petitioners make no showing of any justifiable reason or previous inability to seek and obtain such evidence if it existed. This failure alone would warrant denial of these appliations.

In addition to all of the foregoing reasons for denial of relief, there are still other reasons for denying Simmons' application.

As noted earlier, petitioner Simmons jumped bail after the action had been called for trial on May 12, 1969 and while we were conducting the hearing to suppress evidence on the ground that it had been seized as a result of information learned from wiretaps by the state police. Both Simmons and his counsel, Albert J. Krieger, had inspected the tapes of all wiretaps produced before Simmons fled, and we continued the hearing in Simmons' absence.

Some two and one-half years later, Simmons was apprehended and his case again came on for a jury trial before us, sitting by designation in the Northern District of New York, on February 7, 1972. He appeared at the appointed time, represented still by Mr. Krieger, and moved orally for a preliminary hearing on his claim that "there was illegal wire tapping in which there was federal participation, or at least the wiretapping results were transmitted to federal authorities." His counsel represented that he could establish more than just the wiretaps which had been presented upon the previous suppression hearing, that

he had information that there was at least one other wiretap on the Dalli telephone in the Bronx, that a wiretap was also installed at a public telephone at the same premises, that a conversation concerning the trip upstate was intercepted by state police and transmitted to federal officers, that the surveillance of September 10, 1968 on the thruway and at the Holiday Inn in Plattsburgh took place because of illegal eavesdropping, and that there was also illegal eavesdropping at the Holiday Inn in Plattsburgh. In short, Simmons put forward the same vague allegations now made in the affidavit of ex-Lieutenant Cassino, who was present in court in response to a defense subpoena at the time of the oral motion to suppress. Mr. Krieger represented that Lieutenant Cassino "has had some personal problems of his own and is no longer with the State Police, but he is here prepared to testify" and that accordingly the defendant Simmons would be prepared to proceed preliminarily with the wiretap hearing.

We denied the application for a hearing without prejudice to a proper written application, supported by affidavits, although it appeared on oral argument that the defendant Simmons was quite clearly bound by our denial of the motion to suppress evidence because he had waived his right to be present by absconding during the hearing. Diaz v. United States, 223 U.S. 442, 453–459, 32 S.Ct. 250, 56 L.Ed. 500 (1912); United States v. Gradsky, 434 F.2d 880 (5th Cir. 1970), cert. denied sub nom. Roberts v. United States, 401 U.S. 925, 91 S.Ct. 884, 27 L.Ed.2d 828 (1971); United States v. Dalli, *supra*, 424 F.2d at 48; Glouser v. United States, 296 F.2d 853 (8th Cir. 1961), cert. denied, 369 U.S. 825, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962); Burley v. United States, 295 F.2d 317 (10th Cir. 1961). We then proceeded to empanel a jury.

After the jury was empanelled, we took a short recess and, upon returning to the courtroom, Mr. Krieger advised that he had discussed the possibility of a disposition with his client, Simmons.

Mr. Krieger advised that he had presented Simmons with a written acknowledgment of advice as to his constitutional rights and that Simmons was disposed to enter a plea of guilty to count five of the indictment, which alleged a violation of 26 U.S.C. § 4704(a) and 18 U.S.C. § 2. That count carried a maximum penalty of ten years imprisonment and a fine of $20,000. The defendant then, with the court's permission, withdrew his plea of not guilty and offered to plead guilty to count five. Count five was read to the defendant and he pleaded guilty.

The court then addressed Simmons personally, advised him of his constitutional rights, and interrogated him in full compliance with Rule 11, Fed.R. Crim.P. Simmons acknowledged that he was making his plea freely and voluntarily, after consultation with his counsel, with a full understanding of the nature of the charge and the consequences of his plea. He assured us that he was pleading guilty because he was guilty and for no other reason. We then elicited a factual basis for his plea by his confession in open court that he went to Plattsburgh with Dalli on September 10, 1968 and purchased five kilograms of heroin from Pytel and Bourdeau, and that he did so intentionally, with full knowledge that there was no tax stamp on the package.

The court also elicited from Simmons' counsel, Mr. Krieger, that he had fully advised Simmons of his rights and of any defense that he might have and that he was satisfied that Simmons was pleading guilty to count five freely and voluntarily because he was guilty and for no other reason. We then accepted Simmons' plea of guilty to count five and thereafter sentenced him to a term of ten years imprisonment and fined him $20,000.

■■ It is well settled that a guilty plea, voluntarily and knowingly made, constitutes a waiver of all nonjurisdictional defenses and defects in proceedings up to that point. Moore v. United

States, 425 F.2d 1290 (5th Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 91, 27 L. Ed.2d 83 (1970). The conviction and sentence which follow a plea of guilty are based solely and entirely upon the plea and not upon any evidence which may have been acquired by an unlawful search and seizure. A defendant who pleads guilty, therefore, is foreclosed from attacking his conviction collaterally under 28 U.S.C. § 2255 on grounds of an illegal arrest or unlawful search and seizure. Kaufman v. United States, *supra*; Hoffman v. United States, 327 F.2d 489 (9th Cir. 1964); Smith v. United States, 296 F.2d 220 (6th Cir. 1961), cert. denied, 369 U.S. 876, 82 S.Ct. 1147, 8 L.Ed.2d 279 (1962); United States v. Zavada, 291 F.2d 189, 191 (6th Cir. 1961); Swepston v. United States, 289 F.2d 166, 169 (8th Cir. 1961), cert. denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed. 2d 612 (1962); United States v. Salzano, 241 F.2d 849 (2d Cir. 1957).

■ Wholly apart from the usual rule, it is plain here that the defendant Simmons, fully aware of the allegations now made by Cassino and advised by counsel of his own choosing of all defenses that he might have had, including the alleged other wiretapping now advanced, elected to plead guilty to a tax count carrying a maximum prison sentence of ten years rather than risk imminent conviction on the conspiracy and substantive counts carrying a maximum prison sentence of twenty years, which had already been imposed on his co-defendants after conviction by a jury. Thus, with full knowledge of all the facts, he made a free and intelligent choice to plead guilty and to abandon his claims of illegal arrest and unlawful search and seizure. We, therefore, find that he waived whatever rights he might otherwise have had to challenge his conviction on the grounds now asserted. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

In view of the above findings of fact and conclusions of law, we find it unnecessary to decide whether the federal law enforcement officers may use information, assuming, *arguendo*, that it was learned from unknown wiretaps by state officers in accordance with state law.

Accordingly, the applications of the petitioners Dalli and Simmons for vacation of their convictions and sentences are in all respects denied.

So ordered.

## APPENDIX A

MacMAHON, District Judge.

All four defendants moved before trial, pursuant to Rule 41(e), Fed.R. Crim.P., to suppress evidence seized from them at the time of their arrests. The motions were referred to the trial judge. All defendants contend that the warrantless searches and arrests were without probable cause and, therefore, a violation of their Fourth Amendment rights. Following an extensive evidentiary hearing, we denied the motions from the bench and stated that we would later make detailed findings of fact and conclusions of law. We now specify the findings of fact and conclusions of law supporting our decision.

The question presented is whether the searches were incident to lawful arrests. The answer turns on whether the agents had probable cause "to support a belief . . . that . . . [the defendants were] engaged in criminal activity" at the time of the arrests. Beck v. Ohio, 379 U.S. 89, 95, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964).

In determining probable cause, all the information in the agent's possession, his personal observations, information obtained from the Bureau of Narcotics' records or from other agents, and information from informers of proven reliability must all be considered. Carroll v. United States, 267 U.S. 132, 161–162, 45 S.Ct. 280, 69 L.Ed. 543 (1924); Jones v. United States, 106 U.S.App.D.C. 228, 271 F.2d 494 (1959), cert. denied, 362 U.S. 944, 80 S.Ct. 809, 4 L.Ed.2d 771 (1960); United States v. Kancso, 252 F.2d 220 (2d Cir. 1958).

We find that the agents of the Bureau of Narcotics, participating in the investigation and surveillance leading to these arrests, were in constant intercommunication with each other, and that the agents at the time of the arrests knew the following facts.

Narcotics agents, on a tip from an informer of known reliability, McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), that there was trafficking in narcotics at the Beautee Trail Beauty Parlor in Brooklyn, New York, put the place under surveillance in August 1968.

Dalli, one of the defendants, was observed entering and leaving the Beauty Parlor on a number of occasions. Records of the New York Telephone Company showed that Dalli, from May 20 to August 4, 1968, had placed a number of telephone calls to the phone number of Thomas Pytel. Pytel lived in Montreal and was known by the Canadian police to be associated with persons engaged in smuggling heroin, particularly with Giuseppe Cotroni, a well-known Canadian source of supply for the American narcotics market. See United States v. Bentvena, 319 F.2d 916, 921–926 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). It is a matter of general knowledge among those familiar with the importation of narcotics into the United States, and we judicially notice the fact, that large amounts of heroin are transported from Montreal to New York City along the Northway-New York Thruway route. Cf., Carroll v. United States, supra, 267 U.S. at 170, 45 S.Ct. 280.

Dalli was placed under continuous surveillance. In early September 1968, Dalli was observed in Brooklyn meeting with Stanley Simmons, a man known to the Bureau as a suspected heroin supplier. A few days later, on September 10, Dalli once again met Simmons and they proceeded in a 1967 Cadillac to drive north on the New York Thruway. Narcotics agents were in close pursuit.

The Cadillac pulled into the parking lot of the Holiday Inn motel in Platts-burgh, New York, at 3:30 P.M. on September 10. Simmons and Dalli got out of the car and entered the motel. They were overheard at the desk using a fictitious name, "Forbes," and were given Room 243. The agents placed the entire area under surveillance and exchanged information regarding the movements of Dalli and Simmons, and later Pytel and Bourdeau, by using car radios and walkie-talkies.

Simmons and Dalli remained in their rooms until 7:00 P.M., when Simmons came into the lot, took a blue suitcase out of the Cadillac and carried it into the motel.

Approximately half an hour later, at 7:30 P.M., Pytel drove his Buick automobile bearing Quebec license plates into the parking lot and pulled next to a 1964 Chevrolet convertible occupied by Bourdeau. At the same time, Dalli and Simmons came out of the Holiday Inn and began walking around the parking lot, looking into car windows and very carefully "casing" the surrounding area. After ten minutes of this, they re-entered the motel.

Bourdeau then pulled away and drove to the Howard Johnson's Motor Lodge, situated a short distance from the Holiday Inn. Bourdeau was observed leaving the Howard Johnson's parking lot carrying a black suitcase. He returned to the Holiday Inn parking lot and handed Pytel the black suitcase. Pytel, in turn, carried the suitcase into the motel, where he was observed entering, and later waving from the window of Room 243. Bourdeau then circled the lot twice, left his car, entered the motel, remained inside for no more than a minute, and returned to his car.

A short while later, Pytel left Holiday Inn carrying something hidden under a raincoat which he carried over his arm. He walked over and sat in Bourdeau's car. Pytel was observed handing Bourdeau something that appeared to be money which he had taken out of a brown paper bag. Bourdeau proceeded to count the money. When Bourdeau

finished, Pytel went over to his own car and upon entering placed the brown paper bag on the back seat. Pytel and Bourdeau, each one in their own car, pulled away from the parking lot heading north with narcotics agents following closely behind.

Dalli and Simmons left the motel shortly after Pytel and Bourdeau, one carrying a black suitcase and the other a blue suitcase. They placed the suitcases in the trunk of the Cadillac, covered them with a blanket, got into the car and pulled out of the parking lot heading south with two agents in pursuit.

After the defendants left the Holiday Inn parking lot with the agents in pursuit, the communication between the agents following Simmons and Dalli and the agents following Pytel and Bourdeau, and the sequence of the subsequent arrests is unclear. We find, therefore, that the arrests and the evidence seized at the time of the arrests of one set of defendants cannot be considered in determining probable cause to arrest the other set.

The agents following Pytel and Bourdeau stopped and arrested them in the town of Champlain, New York, within a mile of the Canadian border. The agents searched the defendants and their automobiles and found $2,600. on Bourdeau and a brown paper bag containing $70,000. in cash in the back seat of Pytel's car.

As to the arrests of Simmons and Dalli, George Halpin, the agent in charge of the surveillance team, directed, over the State police radio, the agents who were following them to arrest the two defendants. Since he received no reply from the agents, he broadcasted a description of the defendants' and the agents' cars and asked the State police to detain the defendants. The State police stopped the Cadillac, and shortly thereafter the agents arrived on the scene. The agents placed Simmons and Dalli under arrest, searched them and the Cadillac, and found two suitcases in the trunk of the car, a blue one containing a scale and a black one containing eleven pounds of heroin.

The combination of all the facts known to the agents prior to the arrests would lead anyone but the most naive to the conclusion that the defendants were engaged in criminal activity.

The informer's tip concerning narcotic trafficking in the Beautee Trail Beauty Parlor, Dalli frequenting the Beauty Parlor, telephone records indicating Dalli often called Thomas Pytel, a man known to be involved with the "Cotroni" drug importing operation, Dalli meeting with Stanley Simmons, a suspected heroin supplier, the frequent transportation of heroin from Montreal to New York City along the Northway-New York Thruway, the circumspect manner in which Bourdeau, and later Simmons and Dalli, circled the parking lot to make sure there was no one watching them, Pytel carrying out of the motel something he was hiding in a raincoat, the observation of Pytel furtively handing Bourdeau a sum of money which Bourdeau counted very carefully, and Simmons and Dalli carrying out the suitcase that Pytel had previously brought up to their room are facts that would warn any police officer not only that criminal activity was afoot, but also that it involved dealings in narcotic drugs. Beck v. Ohio, supra, 379 U.S. at 96, 85 S.Ct. 223. We conclude, therefore, that the agents had probable cause to arrest the defendants.

The searches that followed the arrests were limited to the defendants' persons and their automobiles. We find that the searches were conducted in good faith, Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), limited in scope and contemporaneous with the arrests, Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925). We, therefore, conclude that the searches were reasonable and were incident to lawful arrests. See Beck v. Ohio, supra.

Accordingly, the defendants' motions to suppress the evidence seized at the time of their arrests is denied.

So ordered.

Dated: May 19, 1969.

## APPENDIX B

TRANSCRIPT OF ORAL OPINION OF THE COURT, DELIVERED ON MAY 20, 1969 UPON THE CONCLUSION OF THE HEARING TO SUPPRESS EVIDENCE. [SEE TRIAL TRANSCRIPT, pp. 279–282.]

THE COURT: I deny the motion to suppress evidence on a finding that there is no showing that there was any evidence obtained by the Federal government as a result of electronic surveillance or wiretaps of any communication, of any such tainted evidence from the State Police that did have some wiretaps to any officer or agent of the Federal government. At most, the evidence shows only that the State and Federal authorities, specifically the New York State office of the Bureau of Narcotics and the New York office of the State Police were investigating—were engaged in a joint investigation of a murder, of two murders, a double murder, Tuminaro and Gangi, both of whom were known to be traffickers in narcotics. There is no showing at all that any evidence or any leads to relevant evidence relating to this case or the investigation of this case were derived from such tainted sources, if they be tainted.

On the contrary, the evidence shows that long before this double murder, long before any joint efforts of the Bureau of Narcotics and the State Police relevant to those murders were even undertaken, the Federal Bureau of Narcotics did have the Beautee Trail beauty parlor under investigation, under surveillance, and had seen the defendant Dalli frequenting the place; that they did so on a tip from an informer; that they had also obtained independently of any information from the State Police listings of telephone tolls by Dalli to Pytel in Montreal; that they knew from their own records that Pytel was a known associate of people suspected of dealing in narcotics by the Montreal police. They also knew that the Thruway was the favorite pipeline, as many cases in the books will reveal, for the importation of narcotics from Montreal to New York.

The surveillance of the Beautee Trail seems to me to have been independently based on the facts known to the Bureau from untainted sources developed independently of any cooperation with the State Police.

I therefore find that there is no evidence shown here in this hearing, despite exhaustive inquiry by counsel for the defense, of any tainted source of any evidence.

These will suffice for my findings at the present, and the Court may on more thorough review of the evidence make further and more detailed findings, once the Court is in possession of the transcript.

I am confident, however, that such details would only further support my conclusion that there was no tainted evidence obtained here by the Federal authorities.

There is also a question whether even if it were, whether the State wiretap may have been perfectly legal. We may not even reach that question, however.

Well now, proceed.

I deny the motion to suppress.

## APPENDIX C

MacMAHON, District Judge.

Defendants Dalli and Pytel moved, pursuant to Rule 41(e), Fed.R.Crim.P., to suppress evidence allegedly obtained from illegal wiretaps. During the trial and following an evidentiary hearing, we denied the motion and stated that we would later make more detailed findings of fact and conclusions of law. We now specify the findings of fact and conclusions of law supporting our decision

The Bureau of Narcotics and Dangerous Drugs, the federal agency in charge of the investigation that led to the arrests of these defendants, conducted no electronic or wire interceptions of any kind. The New York State Police, however, admitted having conducted wiretaps of the telephones located at the Beautee Trail Beauty Parlor in Brooklyn, New York. They also admitted that some of the intercepted conversations might have involved the defendants Dalli and Simmons.

Pursuant to our direction, the New York State Police, on May 12, 1969, turned over to the defense all records and transcripts of wiretaps involving the beauty parlor's telephones. Counsel for all four defendants, and the defendants Dalli and Simmons themselves, exhaustively searched these records and selected a number of tapes of conversations which they claimed involved them.

After a one-week interruption due to Simmons' flight and Pytel's inability to cross the Canadian border without proper authorization, on May 19, 1969, Dalli and Pytel, the present movants, along with their respective counsel, listened to all the tapes which they had requested. After listening to all of them, they selected only one tape which they claim was related to the Bureau of Narcotics' investigation in this case.

The tape selected was the interception of a conversation between Simmons and Dalli on September 7, 1968, in which they agreed to meet in Brooklyn at 7:00 P.M. on that same day. They met at the appointed time and were observed by the agents. The defense claims that the State Police informed the agents in advance of the proposed meeting and that the agents' surveillance of the meeting and any evidence obtained thereby is tainted by the wiretap.

The agents also observed Dalli's arrival at Kennedy Airport on September 5, 1968. The defendants claim that the agents received information in advance of the meeting from the State Police. As to this claim, however, defendants point to no intercepted conversation which contained the slightest hint of Dalli's expected arrival or any other information which would lead the State Police to know that Dalli would arrive at the airport on September 5, 1968 or any other time. We, therefore, find that no such information taints the agents' observations of Dalli's arrival.

The New York State Police and the Bureau of Narcotics were conducting simultaneous but separate and independent investigations that happened to involve the Beautee Trail Beauty Parlor. The State Police was investigating the Tuminaro-Gangi double murder, and the Bureau of Narcotics an informer's tip that the beauty parlor was a "front" for drug traffic.

All witnesses requested by the defendants were produced. The agents called by the defense, as well as Lieutenant Cassino of the New York State Police, testified that no information concerning these defendants, either obtained through wiretaps or any other means, was communicated by the New York State Police to the Bureau of Narcotics. The only communication between the two agencies was a routine liaison meeting between Lieutenant Cassino and Agent Halpin in mid-August 1968, and although they discussed, along with a number of other matters, the concurrent investigation of the beauty parlor, there was no discussion of any of the four defendants charged in this indictment or of any information the State Police might have obtained through wiretaps. This one and only contact was well before the September 7 conversation between Simmons and Dalli.

There is no evidence that the agents' surveillance of either Dalli's arrival on September 5 or the Dalli-Simmons meeting on September 7 was based on information obtained from the New York State Police.[1] On the other hand, there

---

1. United States v. Bentvena, 319 F.2d 916, 946 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

is a great deal of evidence offering a plausible explanation, other than wiretap information, for the agents' presence at the two incidents. .

The Bureau had been conducting a surveillance of the beauty parlor since May 1968 because of a tip from an informer of known reliability that the place was being used for the sale of narcotics. The agents observed Dalli frequenting the beauty parlor, and a check of his telephone toll slips disclosed that he had made telephone calls to a Canadian, Thomas Pytel, a man known to the Canadian police as an associate of the Cotroni mob, notorious narcotics dealers operating in Montreal.[2]

The Bureau placed Dalli under surveillance. When he left the United States in late August 1968, the agents kept a watch on his house and would often follow his wife. This surveillance of Dalli's wife, and not information from the State Police, led the agents to Kennedy Airport on September 5, where they observed Dalli's arrival.

The agents were, similarly, led to the September 7 Simmons-Dalli meeting because of the twenty-four hour surveillance of Dalli which began immediately upon his arrival on September 5.

The Fourth Amendment "excludes evidence obtained from or as a consequence of lawless official acts, not evidence obtained from an 'independent source'."[3] We find that the agents' observations on the two occasions pointed to by the defense, and in fact on all other occasions relevant to this case, were the product of their own independent investigation and surveillance and were in no way based on or tainted by information obtained, directly or indirectly, from State Police wiretaps or any other illegal means.

We, therefore, conclude that there is no violation of the defendants' rights under the Fourth Amendment or under the Federal Communications Act.

Since we have decided that the State Police wiretap information was not disclosed to the Bureau and does not constitute evidence or a link in the chain of evidence, it is unnecessary for us to decide the legality of the wiretaps under the new state and federal standards.

Accordingly, defendants' motion to suppress is denied.

So ordered.

Dated: June 13. 1969.

2. United States v. Bentvena, *supra*, 319 F.2d at 921–926.

3. Costello v. United States, 365 U.S. 265, 280, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); United States v. Barrow, 363 F.2d 62, 66 (3d Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967).