**Barthelmio DALLI and Thomas Pytel, Petitioners,**

**v.**

**UNITED STATES of America, Respondent.**

**No. 74–CV–114.**

United States District Court, N. D. New York.

June 12, 1975.

**400**

Albert J. Krieger, New York City, for petitioner Dalli.

Robert P. Lewis, Auburn, N. Y., for petitioner Pytel.

James M. Sullivan, Jr., U. S. Atty. for the Northern District of New York, for respondent; Paul V. French, Asst. U. S. Atty., Albany, N. Y., of counsel.

### OPINION

*MacMAHON, District Judge.*[*]

This application for post-conviction relief, brought under 28 U.S.C. § 2255, presents a third attempt to reopen issues previously heard and determined against petitioners.

Petitioners Dalli and Pytel were convicted by a jury on May 26, 1969 on one count of selling, receiving and concealing five kilograms (approximately eleven pounds) of heroin, in violation of 21 U.S.C. §§ 173 and 174, and on one count of conspiracy to commit the substantive offense. Each was sentenced on June 13, 1969 to twenty years imprisonment on each of the counts, the sentences to run concurrently.

The convictions were affirmed on appeal. *United States v. Dalli*, 424 F.2d 45 (2d Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970). The facts of the case are fully narrated in the opinion of the Court of Appeals. Suffice it to say here that Dalli, a resident of New York City, was arrested and five kilograms of pure heroin seized from his automobile on September 10, 1968 while he and a co-defendant, Simmons, were returning to New York on the New York thruway after purchasing the heroin from the Canadian defendants, Pytel and Bourdeau, whom they had met that day at the Holiday Inn in Plattsburgh, New York.

Petitioners and their co-defendants moved before trial to suppress certain evidence, including the five kilograms of heroin, on the ground that the seizure was the fruit of tainted information learned from wiretaps by the New York state police. Following a full evidentiary hearing, we denied the motion, finding that the search was incident to a lawful arrest based on probable cause and that neither the arrest nor the seizure was tainted by wiretaps. Our findings and conclusions were set forth in three opinions which are appended to our opinion in *Simmons* v. *United States*, 354 F. Supp. 1383 (N.D.N.Y. 1973). A summary of those findings and conclusions is necessary to put the present application in proper perspective.

All the wiretaps challenged by the defendants upon the suppression hearing had been duly authorized under New York law (N.Y. Code Cr.Proc. §§ 814–825 (as of 1968)[1] and all recordings and

---

[*] Of the Southern District of New York, sitting by designation.

1. That statute had been recently revised to meet the constitutional standards for electronic surveillance taught by the Supreme Court in *Katz* v. *United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and cases there cited. Thus, the warrants and renewals were strictly limited to wiretapping telephones listed to Beautee Trail Hair Stylists, Inc. and to Ronald J. Carr and had been issued initially on August 5, 1968 by Mr. Justice Miles F. McDonald of the

transcripts of all of the tapes were produced and delivered to the defendants and their counsel for selection of any which they deemed relevant. After thorough examination, the defendants selected only one, a wiretap on the telephone line of Beautee Trail Hair Stylists, Inc., which intercepted a telephone conversation between Dalli and Simmons on September 7, 1968 to the effect that they would meet at 7:00 o'clock that evening. It then appeared from reports of the Federal Bureau of Narcotics and Dangerous Drugs (BNDD), also made available to defendants, that federal agents had observed the 7:00 o'clock meeting.

All witnesses desired by the defendants were produced. The defendants called John T. O'Brien, the BNDD agent in charge of the investigation of the defendants; his superior, George R. Halpin; Agent John W. Maltz, who observed a meeting between Dalli and Simmons on September 7, 1968; and Lieutenant Charles Cassino of the New York state police, who was in charge of a parallel investigation of the defendants by the state police.

Agent O'Brien testified that he did not learn any information from any wiretaps during the course of the federal investigation and that he had no knowledge of any wiretaps relating to the defendants by the New York state police until about two weeks before the suppression hearing (May 12, 1969). Halpin testified that the BNDD had not received any information from the state police learned as a result of wiretaps or otherwise which led to the investigation and arrest of the defendants. Lieutenant Cassino of the state police testified that he did not reveal any information learned from state wiretaps to anyone connected with the BNDD.

Despite exhaustive examination of all the witnesses, the defendants failed to establish any connection between any wiretap and surveillance of any defendant, or the observation of the defendants Dalli and Simmons at the 7:00 P. M. meeting, or, ultimately, the arrest and seizure of the narcotics.

Following affirmance of their convictions, petitioner Dalli and his co-defendant Simmons raised the identical wiretap issue a second time, on November 16, 1972, in petitions for post-conviction relief under 28 U.S.C. § 2255, claiming that the prosecution [2] knowingly used perjured testimony upon the suppression hearing in that Agent O'Brien's testimony that he was unaware of the state wiretaps until two weeks before the suppression hearing and that he did not learn any information from any wiretaps during the course of the federal investigation was false. The claim at that time was based on an affidavit of former Lieutenant Charles Cassino, who was then confined to a federal penitentiary following his conviction on January 27, 1972 in the United States District Court for the Southern District of New York on one count of interstate and foreign travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952, and one count of conspiracy to commit the substantive offense, in violation of 18 U.S.C. § 371. See *United States* v. *Cassino*, 467 F.2d 610 (2d Cir. 1972).

Much of Cassino's affidavit was a reiteration of the allegations and claims previously considered and rejected on the suppression hearing. We, therefore, refused to consider those claims again.[3]

---

Supreme Court of the State of New York, Second Judicial District. The application for the warrants was supported by a detailed affidavit which informed the Justice of the particular need for such wiretaps, the specific basis on which they were to proceed, and the precise intrusion which they would entail.

2. There is no claim that the United States Attorney or his assistant knowingly used perjured testimony.

3. *Kaufman* v. *United States*, 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 22 L.Ed.2d 227, (1969); *Sanders* v. *United States*, 373 U.S. 1, 9, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963);

However, as allegedly new evidence, Cassino claimed that after the September 7 meeting between Dalli and Simmons, the state police tapped

"telephone numbers presently unknown to me located at or near the residence of Dalli. . . . It was on these telephones that an arrangement was made between Simmons and Dalli to go to upstate New York on September 10, 1968. My best recollection is that that telephone conversation took place on September 9, 1968 and was first heard by our office early in the morning hours of September 10, 1968. . . . Subsequent to May 1969, I learned that it was a common practice during the course of this investigation for Investigator Kaynor [sic] to take the tapes representing the previous day's eavesdropping and together with Agent John J. O'Brien of the Bureau of Narcotics and Dangerous Drugs, go to . . . [a cubicle designed for audition of recorded telephone conversations] and there review the tapes. . . . As far as the 10th itself is concerned, I received a call early in the morning from Investigator Kaynor [sic] who told me of this probable meeting and I ordered him to contact all necessary parties immediately as to what we anticipated would occur. . . . Amongst those whom Investigator Kainor [sic] was to contact were Agents of the Bureau of Narcotics and Dangerous Drugs. The investigation and surveillance of September 10, which resulted in the arrest of Dalli and Simmons, Pytel and Bordeau, came about as a result of the orders which I gave after receiving the information from Investigator Kainor [sic] concerning the meeting between Dalli and Simmons."

We denied the petitions without a hearing, finding, among other things, that Cassino's allegations were indefinite, vague and conclusory and that, in-

sofar as he sought to connect information by the state police from wiretaps on unknown telephones to the arrest of petitioners and seizure of the narcotics by federal agents, his statements were hearsay too insubstantial to require a hearing or to support the petition.

The Court of Appeals agreed with our determination,[4] and in an opinion by Judge Mansfield demonstrated the specific deficiencies and omissions of the Cassino affidavit. Thus, for example, the court noted that while Cassino stated that he "learned that it was a common practice . . . for Investigator Kaynor [of the New York State Police] to take the tapes representing the previous day's eavesdropping and together with Agent John O'Brien of the Bureau of Narcotics and Dangerous Drugs, to go to one of these rooms and review the tapes," he did "not say how or from whom he learned this;" that there was "no indication that the wiretaps or transcripts of them were in fact furnished to the federal officers;" and that Cassino's averment that "telephone numbers presently unknown to me located at or near the residence of Dalli were tapped" was too indefinite to determine whether it was "based on hearsay or on Cassino's personal knowledge. . . ."

Four months after the decision of the Court of Appeals, counsel for Dalli filed the present amended petition incorporating the earlier petition and asserting that "the deficiencies noted by the Court of Appeals are completely cured by the present petition." The petition contained two affidavits, one from Charles Cassino and the other from former BNDD Agent Dennis J. Hart.

Cassino, curing the deficiencies, now remembered that Special Agent O'Brien had told him that he, O'Brien, was aware during the investigation of the state police wiretaps on the Beautee Trail Beauty Parlor and "that without the N. Y. S. P. wiretaps, the FBNDD

*Thornton v. United States*, 125 U.S.App.D.C. 114, 368 F.2d 822, 823 (1966) (dissenting opinion of Wright, J.).

4. *Dalli v. United States*, 491 F.2d 758 (2d Cir. 1974).

would never had made [sic] this case." Cassino also now swore that Investigator Kayner of the state police also told him that O'Brien was aware of the wiretaps. Special Agent Hart swore that Special Agents O'Brien and Halpin told him during the course of the investigation that the state police had a wiretap on the Beautee Trail; that he, Hart, should not let the newer agents working on the surveillance know about these wiretaps; and that Investigator Kayner was passing information from the wiretap to the federal agents.

The factual dispute created by these allegations of newly discovered evidence was, therefore, clearly focused. Did the federal agents in fact receive information from the New York state police wiretaps? If so, were the wiretaps illegal, and if found to be illegal to what extent did this information taint the federal investigation?

■■ In order to resolve these issues and on consent of the government, we held an evidentiary hearing. Petitioners called witnesses seeking to establish their claim that the federal agents had been given information from the state police wiretap. After having observed the testimony of the witnesses at the hearing and having carefully and exhaustively reviewed the transcript of that hearing and the prior hearing and trial, we conclude that the petitioners have failed to establish their claim that the federal agents received any information from the .state police wiretaps.[5] Thus, we do not reach the question of the legality of the state wiretap order and, consequently, the question of taint.

The testimony presented at the hearing was in large part a repetition of the testimony presented during the pretrial suppression hearing and trial. We will review it, therefore, only to the extent that it pertains to the allegedly newly discovered evidence.

**I. Cassino's Testimony**

Charles Cassino testified that in April 1968 he was a Lieutenant with the New York State Police and in charge of a detail of state police narcotics investigators stationed at Wards Island, New York. Petitioner Dalli was the subject of one of Cassino's investigations and during the course of the Dalli investigation wiretaps were installed at Beautee Trail Hair Stylists, Inc. in Brooklyn and in two other locations. Cassino testified that in August 1968 he told George Halpin, a BNDD supervisory agent, that "we were doing our thing" at the Beautee Trail. Cassino interpreted this statement to mean that he had told Halpin that the state police were using wiretaps.[6]

Cassino further testified that in May 1968 he assigned Investigators Kayner, Rock, Smith, Gross, Palumbo and others to work on the Dalli investigation, including manning the wiretaps. He testified that his investigators were instructed to cooperate with federal agents but that he understood that the federal agents were to do only physical surveillance. He further testified that in August and September 1968 he had seen Agent O'Brien with Investigator Kayner, and on an unspecified number of occasions he saw Agent O'Brien sitting in cubicles with Investigator Kayner. These cubicles, according to Cassino, were commonly used to transcribe tapes. However, based on Cassino's prior testimony at the original suppression hearing categorically denying that any information from the wiretaps was ever given to the federal agents, we must conclude that these observations, if they

---

5. The burden of proof upon a hearing under 28 U.S.C. § 2255 is on the petitioner. *Williams* v. *United States*, 481 F.2d 339 (2d Cir.), *cert. denied*, 414 U.S. 1010, 94 S.Ct. 373, 38 L.Ed.2d 248 (1973); *Papalia* v. *United States*, 333 F.2d 620 (2d Cir.), *cert. denied*, 379 U.S. 838, 85 S.Ct. 74, 13 L.Ed.2d

45 (1964); *Catalano* v. *United States*, 311 F.2d 186 (2d Cir. 1962). *Cf., Sanders* v. *United States*, *supra.*

6. Hearing Transcript, p. 257–h (hereinafter "Tr.").

ever actually occurred, did not suggest to Cassino that O'Brien was being given information from the wiretaps.[7]

Cassino also testified that in December 1971 he had four conversations with Investigators Kayner and Mermel. During the course of several of these conversations, Kayner is supposed to have told Cassino that "not only O'Brien but others know about it," referring to the Beautee Trail wiretap. During cross-examination, it became apparent that these conversations were in the context of information Cassino was giving to Kayner and Mermel about corruption within the New York State Police. This occurred after Cassino's federal conviction and before sentence. During the course of the third conversation, Investigators Mermel and Kayner were concerned about how information about this wiretap was "leaked" to Simmons' lawyer prior to the May 1969 suppression hearing. Cassino denied that he was the "leak" and said that Investigators Kayner and Mermel told him that they suspected Agent O'Brien. It should be noted that during cross-examination, Cassino, in describing the substance of these conversations, omitted any reference to Kayner's having told him that O'Brien knew of the wiretaps and added it only as an afterthought after completing his description of the conversations.[8]

Cassino also testified that in January or February 1972, when he and Agent O'Brien were travelling together to Utica, New York to testify at the trial of co-defendant Stanley Simmons, O'Brien admitted to Cassino that he, O'Brien, "had known about the Beautee Trail wiretap since its inception." At the time of this conversation, Cassino had been convicted of conspiracy and violation of interstate gambling statutes. During this alleged conversation, O'Brien was under indictment for perjury.

There are a number of factors which lead us to conclude that Cassino's testimony as to this admission by O'Brien is totally perjurious: Cassino's prior testimony; his demeanor as a witness; his tardiness in coming forward; his conviction which bears on both his credibility as a witness and his motive to testify against the interests of the government; the convenient way in which he structures his present testimony to avoid categorical contradiction of his prior testimony; and last, but not least, the utter absurdity of such a conversation under the circumstances. It is utterly inconceivable to believe that Agent O'Brien, while under indictment for an unrelated perjury charge of which he was later acquitted, and knowing that Cassino had just been convicted and was facing a prison sentence, would admit to Cassino that he had committed perjury upon the suppression hearing and trial before this court.

Similarly, Cassino's testimony as to Investigator Kayner's statement that "not only O'Brien but others knew about it," is just as incredible. On cross-examination, it was not mentioned except as a gratuitous afterthought and was apparently a statement made in the context of a suspicion by Kayner that O'Brien had "leaked" information to Simmons' lawyer. In any event, for the reasons already stated, we reject Cassino's testimony to the extent that it attempts to create some basis for finding that O'Brien or any of the other federal agents had knowledge of the wiretaps in August and September 1968.

II. *Hart's Testimony*

Former BNDD Agent Dennis J. Hart testified that in August and September 1968, he was assigned to work on the Dalli investigation. Special Agents Halpin and O'Brien were his supervisors. Hart described his work as mainly surveillance of the Beautee Trail. He testi-

---

7. Cassino admitted on cross-examination that he did not infer from these observations that Kayner was giving O'Brien information

from the wiretaps. Tr. 327. See also Tr. 257–1.

8. Tr. 310–311.

fied that on August 21, 1968, he was told by O'Brien that the state police had a wiretap on the Beautee Trail and was instructed not to tell the younger agents about it. He claimed to be able to place the date by referring to his notes, which in fact contain no reference to any such conversation.[9] Hart then quickly changed his testimony to include Agent Halpin in this conversation, and, shortly thereafter, testified that in fact O'Brien did not mention the state police during this August 21, 1968 conversation but did so later during an August 28, 1968 conversation.[10]

Hart also testified that O'Brien gave him information from the wiretap to assist in surveillance. According to Hart, on one occasion on September 6 or 7, 1968, O'Brien told Hart and other agents: Don't worry about anything. We will know when somebody is going to move." [11] Hart testified that on another occasion, he and other agents were assigned to conduct surveillance with the state police, but he could not remember the name of the trooper working with him; nor could he remember ever seeing that trooper before or since.[12]

Hart testified that on September 7 or 8, 1968, he was conducting surveillance of Dalli's apartment in the Bronx and was told by O'Brien that there was a wire "in the apartment or around the apartment." Hart also testified that immediately prior to his testifying at Dalli's trial in May 1969, he was told by O'Brien in the presence of Investigator Kayner and Special Agents O'Neill, Finnerty and Mosher not to mention the wiretap.[13]

On cross-examination, it was revealed that Hart was discharged from federal service after he was indicted in the Eastern District of New York for ex-

torting money from narcotics violators. Hart's first trial, in November 1970, resulted in a mistrial, and the government finally dismissed the charges against him during a second trial.[14] It was only after his discharge from federal service, after his indictment, two trials and dismissal of the charges against him, that Hart first mentioned these facts concerning his knowledge of the wiretap. He gave this information to a private investigator, employed by petitioner Dalli, in November 1973 and signed an affidavit as to these facts on January 24, 1974. Hart testified on cross-examination that he was paid a total of $1,300 by the investigator. However, all payments were in cash so that no records of the exact amount actually exist.[15]

On cross-examination, as to Special Agent Halpin's having told Hart not to mention the wiretap to any of the "junior agents," Hart was able to name only one agent who was junior to him, who had worked in the investigation.[16] In fact, Hart was one of the least experienced agents working on this case.

We find Hart's testimony, to the effect that Agents O'Brien and Halpin told him that they knew about the wiretaps and that he should not tell junior agents, completely perjurious. Similarly, we find his entire testimony, to the extent that he or any of the other agents received information from the state wiretaps, untrue. The factors leading to that conclusion include: Hart's tardiness in coming forward; his failure to include any of these statements which he claimed he considered nonincriminatory in any contemporaneous reports; his motive to testify falsely because of his discharge from federal service and because of his apparent need for money which was paid to him in cash; his demeanor as a witness;[17] and the logical

---

9. Tr. 128–129, 186; Dalli Exhibit 10.

10. Tr. 132–133.

11. Tr. 134–135.

12. Tr. 136–138.

13. Tr. 139–140, 144.

14. Tr. 187–188.

15. Tr. 163–175, 177.

16. Tr. 189–192.

17. This factor is particularly important with regard to Hart's testimony. Hart displayed

inconsistency of telling Hart not to mention the wiretaps to junior agents when Hart was one of the most junior of the agents involved in the investigation.

### III. The Testimony of Rock and O'Neill and Kayner's Affidavit

Our findings as to the incredibility of the testimony of Cassino and Hart is reinforced by other testimony offered by petitioners during the hearing, that is, the testimony of State Police Investigator Alexander Rock and Special Agent John O'Neill and by the affidavit of State Police Investigator Edward Kayner.

Investigator Rock was working under Cassino's command, and in August 1968 first became involved in the investigation of the Beautee Trail when he was ordered by Cassino to obtain an order permitting a wiretap for the Beautee Trail. Rock testified that the information he included in the applying affidavit was based on his own observations, on information obtained from other state police investigators, and from discussions with Special Agent O'Brien and O'Brien's informant. Rock testified that as a general matter there was an exchange of information between the state police and the BNDD on narcotics investigations. Rock further testified that he knew that BNDD agents were conducting an investigation of Dalli which involved surveillance of the Beautee Trail, but that he did not know they were specifically investigating the Beautee Trail.

Rock also testified that he had some discussions with the federal agents concerning what they were doing but that he had been specifically instructed by Cassino not to give any information from any of the three wiretaps utilized in this investigation to anyone in the federal government. Rock testified that he in fact gave no such information to the federal agents.[18]

Agent John O'Neill testified that he was one of the BNDD agents assigned to the Dalli case in August and September 1968. Agent O'Neill could not recall O'Brien's ever having told him about any upcoming events. O'Neill could not recall any statements which would suggest that O'Brien had some advance notice of what would occur.[19]

State Police Investigator Edward W. Kayner, the individual who, according to Cassino and Hart, was turning over to BNDD information from the wiretaps, submitted an affidavit as part of the government's original answering papers. In that affidavit, Kayner swears that he did not turn over to Agent O'Brien or any other BNDD agent any information obtained from the wiretap.

### IV. Conclusion

We find that the testimony of Cassino and Hart, to the effect that Special Agent O'Brien or any of the other federal agents received information from the state police wiretap, is incredible. We further find, based on the testimony of O'Brien, Halpin and Cassino at the original hearing in May 1969, the testimony of Rock and O'Neill at the recent hearing, and Kayner's affidavit, that the federal agents engaged in this investigation did not receive any information from the state wiretaps.

Accordingly, petitioners' application to vacate their sentences is denied in all respects.

So ordered.

---

a great deal of nervousness when he was questioned both on direct and cross-examination as to the statements made to him by O'Brien and Halpin and when he was questioned as to the money paid to him by petitioner Dalli's investigator. This included noticeable perspiration, a higher tone of voice, and fidgeting in the witness chair. All of this has even greater significance since Hart, as a former agent, had testified before, and when questioned on less crucial subjects during his testimony on this hearing appeared perfectly normal.

18. Tr. 366, 425–426, 430–431, 508.

19. Tr. 537–538, 541–542.